***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Jones and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing and in a Pre-Trial Agreement as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. At all relevant times, an employment relationship existed between plaintiff and defendant.
3. Defendant is self insured and Gallagher Bassett Services is the adjusting agent.
4. Plaintiff's average weekly wage is $321.00.
5. Defendant paid plaintiff certain disability benefits and should this claim be determined to be compensable, the employer is entitled to a credit pursuant to N.C. Gen. Stat. § 97-42.
6. Plaintiff's medical records were stipulated into evidence asStipulated Exhibit 1.
7. Industrial Commission proceedings leading to hearing on January 23, 2001 were stipulated into evidence as Stipulated Exhibit 2.
8. The issues are: (i) whether plaintiff sustained an injury by accident to her low back and left leg on March 28, 2000; and (ii) if so, what compensation, if any, is due plaintiff.
 *********** EVIDENTIARY RULINGS
The objections raised in the depositions of Philips J. Carter, M.D., Frank J. Rowan, M.D., and Edward H. Weaver, M.D., are OVERRULED.
Defendant's motion to amend the transcript of the evidence is hereby GRANTED. Plaintiff's medical records for period March 28, 2000, forward shall be Stipulated Exhibit No. 1. Plaintiff's additional medical records for the period of January 6, 2001, through February 6, 2001, shall be Stipulated Exhibit No. 2. Defendant's Medical Record Index shall be Stipulated Exhibit No. 3. Plaintiff has no objection to these exhibits. Defendant's motion also requests that Plaintiff Exhibit No.11 be removed from the transcript of the evidence, in that the Deputy Commissioner did not admit it. Plaintiff objects to the removal ofPlaintiff Exhibit No. 11 and asks the Full Commission to reverse the deputy commissioner and admit the exhibit. This portion of defendant's motion is hereby GRANTED based on a lack of foundation in the record.Plaintiff Exhibit No. 11 shall be removed from the transcript of the evidence and attached exhibits.
 ***********
Based upon all the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 44 years old and had an 11th grade education. Plaintiff has been employed by various employers during her career, and most of her jobs have been unskilled labor positions.
2. Defendant employed plaintiff as a blue jean inspector. Plaintiff worked in the shipping department and was responsible for identifying and sorting irregular jeans.
3. Plaintiff's job responsibilities included standing and lifting boxes of jeans weighing up to 30 pounds. Plaintiff worked a ten hours shift during the second shift (between 3:30 p.m. and 2:00 a.m.) on four days a week. She had no difficulty performing her job duties prior to March 28, 2000, and had a good work record. While plaintiff was at work in about 1996, a bag of jeans hit her neck and head, which caused her no lost wages. The Company physicians told plaintiff that she had spurs on her neck, and she did not file a claim.
4. Plaintiff had no history of any problem with her back prior to March 28, 2000, and no history of depression that interfered with her ability to work.
5. When plaintiff arrived at work at about 3:30 p.m. on Tuesday, March 28, 2000, she found her workstation to be "a mess." Boxes of irregular jeans were everywhere on the floor and the shelves were full because the employee who performed plaintiff's duties during the first shift did not show up for work. Plaintiff reported to shift manager Darren Martin that she needed help to process the backlog. Mr. Martin indicated he would try to find assistance, but failed to do so.
6. Plaintiff told defendant's agent in her recorded statement that on March 28, 2000, she "was in a hurry that night `cause the first shift didn't work on that job and I was trying to hurry up [sic]." She found boxes of jeans on the floor, and stated:
 . . . [S]ome of `em were big jeans and then I had small jeans. But the box I picked up, I bent over to pick the box of sorted jeans off of the floor and I turned around to go to my right to put it up on the table which was a little bit higher than me, and I twisted to the right and I felt something in my back pop and it just started burning real bad and it went down my left leg into my hip. And all the way down to my foot. And I about passed out it hurt so bad [sic]. . . .
7. Plaintiff's injury occurred just before break time. During her break, plaintiff reported a cut finger and hurt back to Mr. Martin. Plaintiff testified that he rolled his eyes and made no other response. Plaintiff additionally reported her injury to her supervisor, Judy Harris, several days after it occurred.
8. On March 29, 2000, plaintiff returned to work but was unable to perform the lifting required by her regular job duties. Plaintiff received assistance with lifting from another employee.
9. Judy Harris arranged an appointment for plaintiff to receive medical care with PrimeCare, the company health care provider. PrimeCare returned plaintiff to light duty work sorting UPC labels in the trimming department. This job could be performed standing or sitting and involved less lifting. Plaintiff continued to have back pain and felt this job was too strenuous for her.
10. On April 10 plaintiff was examined by her family physician, Dr. Keith Van Zandt, who noted: (1) her back injury on March 28, 2000, lifting boxes of jeans at work; (2) her visit to PrimeCare, where she was prescribed Darvocet and therapy; and (3) her complaint that it was difficult for her to sit. Dr. Van Zandt wrote, "she has no history of back [problems] and is fairly motivated to return to work." On exam, he found "some diffuse lower lumbar area tenderness which does extend to the buttocks but no further down." His diagnosis was "low back strain, 3/28/00 while lifting boxes at work." He prescribed Aleve, therapy, and no work until April 17, 2000."
11. On April 13, 2001, Novant Health's physical therapist, Amy Reynolds, noted that she evaluated plaintiff on the prior day, April 12, 2001. In clinic, Ms. Reynolds found plaintiff to exhibit decreased lumbar active range of motion with pain; limited sitting up to 20 minutes; decreased hip flexion; positive straight leg raising on the right at 62°, and on the left at 50°; and a guarded gait. In her written evaluation, Ms. Reynolds noted, "I feel that these problems are consistent with the patient's primary diagnosis." Ms. Reynolds planned to see plaintiff two times a week for four weeks. Plaintiff participated in physical therapy treatments on April 12, 14, 17, 20, 24, 28, and May 1, 2000.
12. Physician Assistant Burnie R. Little at Dr. Van Zandt's office saw plaintiff on April 17, 2000. P.A. Little prescribed Voltaren and took plaintiff out of work until April 24, 2000. On April 18, 2000, plaintiff returned to PrimeCare, where she saw Physician Assistant Harold B. Hall. P.A. Hall felt plaintiff was making progress and that she should continue physical therapy.
13. On April 24, 2000, plaintiff returned to P.A. Hall. He restricted plaintiff to sedentary work for 4 hours a day. In his medical notes, P.A. Hall wrote that plaintiff was "having numbness in left leg." On April 26, 2000, P.A. Hall took plaintiff out of work.
14. On April 29, 2000, Dr. John Evans Jr. read a lumbar MRI to reveal "no signs of significant lumbar disc disease [and] . . . [n]o significant bulge or focal disc herniation is present." Dr. Evans also noted a "[m]ild developmental type of central canal stenosis but otherwise normal scan"(emphasis added).
15. On May 8, 2000, plaintiff sought treatment at Novant Health's Forsyth Medical Center for severe spasms in her low back. On that same day, plaintiff returned to PrimeCare, where she saw Dr. Passero who referred her to an orthopaedist.
16. Plaintiff was last able to work on May 11, 2000.
17. On May 12, 2000, plaintiff returned to Dr. Van Zandt, who found on examination "very diffuse tenderness and muscle tightness in her upper and lower back," and, "fairly marked spasms"
18. On May 15, 2000, plaintiff was seen by t Dr. Greg Holthusen, an orthopaedist, who noted her March 28, 2000, low back injury at work: "It was explained to her at the reception desk that worker's compensation had said they would not pay for a visit here, but wanted her seen by Dr. Carter [an orthopaedist in Greensboro]." On examination, Dr. Holthusen wrote that she limps on her left leg with a positive left leg raising test, with right leg negative. Dr. Holthusen felt she may have a "musculo-ligamentous injury," and prescribed Lodine and Ultram.
19. Defendant arranged for plaintiff to be seen by Dr. Philips J. Carter, a Greensboro orthopaedic surgeon, who first examined plaintiff on May 24, 2000. Dr. Carter recorded plaintiff's history of a March 28, 2000, low back injury at work lifting a box of jeans while twisting to her right, and her unsuccessful attempt at light duty work. On examination, he wrote she was "quite over reactive," with "tender lipoms overlying the left sacroiliac," and, "weakness with dorsiflexion of the left ankle and the left big toe." Additionally, Dr. Carter noted: [s]he has an MRI with her which shows some congenital spinal stenosis but no major disc rupture and it is from an unfamiliar place and it is a little difficult for me to read" (emphasis added). As a result, Dr. Carter prescribed "a myelogram with a standing x-ray or with EMG and nerve studies on the left leg," as well as Celebrex with light therapy to help plaintiff relax and loosen up. Dr. Carter's diagnosis was lumbar sprain.
20. On June 12, 2000, defendant's agent wrote Dr. Carter: "We will allow you to conduct an EMG," and requested that he answer certain questions about plaintiff's condition and ability to work. Defendant's agent refused to pay for a myelogram as requested by Dr. Carter.
21. On June 21, 2000, plaintiff returned to Dr. Van Zandt, who found her "having increasing financial difficulties as well as chronic pain," and, "increasingly tearful and developing symptoms of depression" with inability to fall asleep and frequent awakenings.
22. On June 22, 2000, plaintiff was seen by Dr. Keith Willis, a neurologist, who noted the EMG testing showed "the motor amplitudes on the left were significantly lower than that on the right," with all other testing normal and no evidence of an L5 radiculopathy.
23. On July 12, 2000, plaintiff returned to see Dr. Carter, who reviewed the EMG tests. He felt plaintiff's physical findings were "quite unremarkable." Dr. Carter wrote as follows:
 I have requested further PT, but the insurance company has failed to do that. I am not sure why they are willing to pay my bill to see her again and yet are not willing to do the treatment that I recommend . . . She is given a note to remain out of work until we get something to develop (emphasis added).
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident to her back on March 28, 2000. N.C. Gen. Stat. § 97-2(6).
2. Due to chronic back pain, plaintiff continues to be disabled from her injury by accident on March 28, 2000, and is entitled to temporary total disability compensation at the rate of $214.00 per week from May 11, 2000, and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to have defendant pay for all medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure, or lessen the period of disability, including treatment for plaintiff's chronic back pain and related depression. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay plaintiff temporary total disability compensation at the rate of $214.00 per week from May 11, 2000, and continuing until further Order of the Commission, subject to an attorney's fee set out below. As a portion of this amount has accrued, defendant shall pay such amount directly to plaintiff in a lump sum.
2. Defendant shall pay for all medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure, or lessen the period of disability, including treatment for plaintiff's chronic back pain and related depression.
3. Defendant shall pay to plaintiff's counsel a reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded to plaintiff in paragraph 1 above, which shall be deducted from the lump sum due plaintiff and paid directly to counsel. Thereafter, every fourth check shall be paid directly to plaintiff's counsel.
4. Defendant shall pay the costs.
This 5th day of August 2002.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER